# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 16, 2003 Session

## STATE OF TENNESSEE v. EDWIN GOMEZ and JONATHAN S. LONDONO

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-280     Cheryl Blackburn, Judge**

---

**No. M2002-01209-CCA-R3-CD - Filed February 18, 2004**

---

The Appellants, Edwin Gomez and Jonathan S. Londono, were convicted by a Davidson County jury of conspiracy to commit aggravated robbery, facilitation of first degree felony murder, facilitation of especially aggravated robbery, and facilitation of aggravated robbery. Gomez and Londono were ordered to serve forty-nine years in the Department of Correction as Range I standard offenders. On appeal, Gomez presents the following issues for our review: (1) whether the trial court erred in not suppressing the photographic line-up and subsequent in-court identification and (2) whether it was error to permit testimony concerning $19,600 found in Gomez's apartment. Londono argues that: (1) the trial court erred by admitting the statements of Co-defendant Bryant Guartos; (2) the trial court erred by admitting the statements of the victim as either an excited utterance or a dying declaration; and (3) the evidence was insufficient to support the verdicts. Both Gomez and Londono argue that the length of their respective sentences was excessive and that consecutive sentencing was improper. After a review of the record, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Glenn R. Funk and Cynthia M. Fort, Nashville, Tennessee, attorneys for Appellant, Edwin Gomez; David A. Collins, Nashville, Tennessee, and James Stafford, Houston, Texas, Attorneys for Appellant, Jonathan S. Londono.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Elizabeth B. Marney, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Bret Gunn and Roger Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## Factual Background

On March 16, 1999, Carlyle & Company Jewelers, located in the Green Hills Mall of Nashville, had a special showing of approximately 100 to 110 Rolex watches with an estimated value of $750,000. The following day, March 17th, two security guards, Roy Rogers and Eugene Nagele, were removing the watches from Carlyle & Company in order to transport them to another showing. Nagele exited the mall first in order to inspect a stairwell and elevator area. Rogers began walking to their Jeep, and Nagele "fell in behind him about 25 or 30 feet." Nagele then heard the "sound of running footsteps behind" him. Nagele shouted, "Roy," and "started to duck down and turn, and there was a thump and a shot." After getting a brief glance of a hooded figure and hearing voices speaking in a foreign language, Nagele was struck in the back of his head and lost consciousness for a short time. His Colt pistol, estimated at approximately $1,500, was stolen. When Nagele awoke, he heard Rogers yelling, "Gene, Gene, I've been shot." Rogers twice asked Nagele to "stop the bleeding." Rogers died twenty-one days later of complications from his gunshot wound.

Deborah Sloan arrived at the mall around 9:10 or 9:15 a.m. Ms. Sloan was taking her children "to a Gymboree play class in the Mall" that morning. She stated that no more than a minute after she pulled her minivan into the parking lot, she "heard a bang, a loud bang, and a lot of running and rustling and things like that." She observed one man lying on the ground, a "second man was sort of on his hands and knees faced away from [her], and then there was three men just running around[.]" She then saw two of the men who were "running around" pick up the steel boxes, which contained the watches, and the third man "lean over beside the man who was lying on the ground and pick up a gun." Further, she observed the men leave the parking lot and drive away in a minivan. She called 911 on her cell phone and remained at the scene until police arrived.

Officer Thales Finchum of the Nashville Police Department was the first to arrive at 9:25 a.m. He found Rogers lying on the ground and recognized that he was "clearly in bad shape." Finchum asked Rogers what happened, and Rogers responded that the man who shot him was a "mulatto" wearing a dark hood. Ms. Sloan described the assailants as having "dark skin, dark hair, fairly average height and weight as far as size." She also commented that "[t]hey all had on very big baggy clothing and very heavy loose jackets" even though it was a warm day in the middle of March. Sloan estimated that the three men were in their "twenties." She also observed the minivan as being "purplish-maroon color" with "gold lettering and gold trim on the wheels."

Christina Hudson, a mall employee, was in the parking lot on the morning of the robbery. As she was sitting in her car, she observed a dark-skinned male, that she described as either Hispanic or Black, get into the passenger side of a purplish-colored minivan. As the man got into the vehicle, she saw three other people "raise up." She described the other three men as also Hispanic or Black. Ms. Hudson observed three of the men exit the vehicle, but she did not know about the robbery and shooting until "about an hour afterwards." She was unable to identify any of the men in the van.

Michelle Nicholson was traveling on I-40 a little after 8:00 a.m. on March 17th. While driving, she observed a maroon van with Florida plates "weaving in and out of traffic." Her first observation of the van was "[r]ight at the White Bridge Road exit." She described the four

occupants of the vehicle as "all male, Hispanic, dark hair." According to Ms. Nicholson, the van exited on Hillsboro Road, which would "be the way to Green Hills Mall." Later that day, when she heard news reports of the robbery and the description of the van, she called the police department and reported the van she had seen. Nicholson was unable to identify either of the Appellants.

Upon receiving this information from Ms. Nicholson, Sergeant Freddie Stromatt of the Nashville Police Department concluded that the suspects "possibly stayed at a motel along the route of I40 west of Nashville, headed out towards Memphis." Stormatt "instructed detectives to go to each motel from the Charlotte Pike exit all the way back to the county line, to check each motel and see if they had any male Hispanics that had been staying in that motel that were driving vans." One of the detectives discovered that male Hispanics driving two vans had stayed at the Howard Johnson Motel at I-40 and Charlotte Pike.

Sue Madan, the manager of the Howard Johnson, told police that the men rented rooms 202 and 204. She provided telephone records for these two rooms. These records identified telephone calls from the motel to two pay telephones, one located inside the mall directly across from Carlyle & Company and the other located outside a restaurant "[a]bout a block-and-a-half" down the street from the mall. These records also showed that calls were placed from the rooms using several cards. The record for one of the cards showed that calls were placed from the Howard Johnson to Miami on March 15, 1999, then from Alabama to Miami on March 17,1999, and then from Gomez's home telephone number to Bogota, Colombia on March, 18, 1999. Videotapes from the Howard Johnson were also provided to the detectives. Detective Harold Haney of the Nashville Police Department testified that the tapes showed two men at the front desk, a maroon van and a white van in the motel parking lot, and people coming and going from the vans. However, Detective Haney admitted that the tapes were not clear enough to identify any of the individuals.

Robin Capps, a housekeeper at the motel, found a "seat, like that come out of a van" in Room 204. She and another housekeeper removed the seat from the room. The seat was later recovered by the police.

Tiffany Lee Dozier, the Howard Johnson front desk clerk, registered "at least" five Hispanic men in March. She recalled that they had two minivans, one white and the other maroon. She stated that she interacted with one man in particular. He checked the group into the hotel and "was flirting with [her]." According to Dozier, "[h]e spoke very good English." Ms. Dozier was later shown a photo array and identified Co-defendant Bryant Guartos as this man. In addition, Ms. Dozier identified Londono from a pre-trial photo array as the man who "would come to the desk with the guy that spoke English." Ms. Dozier was unable to identify either of the Appellants at trial.

A search of Room 204 was conducted. Detective James Arendall of the Nashville Police Department found a box of ammunition on the top shelf of the closet. The bullet taken from the victim Rogers was consistent with the ammunition found in the motel closet. Following fingerprint analysis, it was determined that Guartos' fingerprints were on the telephone receiver, Londono's fingerprints were on the ammunition box, and Gomez's fingerprints were on the telephone book.

On July 29, 1999, Detective Norris Tarkington of the Nashville Police Department presented a photo array to Ms. Sloan. Ms. Sloan identified Co-defendant Bryant Guartos as the man who stole

the security guard's gun. On October 10, 2000, Detective Tarkington again presented a photo array to Ms. Sloan, and she identified Londono as "the person that I saw pick up the last of the boxes and head back toward their minivan." On this same date, Ms. Sloan was shown a second photo array, and she identified Gomez as "the other man who was carrying boxes." Ms. Sloan identified both of the Appellants at trial and testified that she was "very sure" that they were the two men involved in the crime.

Barbara Franklin, an employee of Carlyle & Company, testified that a Hispanic man came into the store the afternoon before the robbery and was asking questions about the Rolex watches. She later identified this man as Co-defendant Bryant Guartos. She also testified that another man, who spoke "halting" English, accompanied Guartos; however, Ms. Franklin was unable to identify either of the Appellants as the man who accompanied Guartos.

Londono's girlfriend, Julie Jimenez, testified that she was living in Miami with Londono in the Spring of 1999. During that time, Londono left for "[s]even or ten days" but did not tell her where he was going. He told her the purpose for the trip was to make some money. She testified that Gomez, Co-defendant Guartos, Maria Sierra, and another unidentified individual accompanied Londono on this trip. According to Jimenez, the group left in two vans, one white and the other maroon. Londono called Jimenez while he was gone and told her that he was in Tennessee. She recognized Gomez's voice in the background of this phone conversation. At some point before Londono returned to Miami, he called Jimenez and told her that he wanted to give her a Rolex watch. Upon his return, Londono related the events of the robbery to Jimenez. While he gave a different version of events, he did admit to taking the watches. Thereafter, Londono and Jimenez went on a shopping spree and spent approximately $3,000 on furniture and a television set. According to Jimenez, Londono insisted that she purchase everything in her name. He also gave Jimenez some Nashville postcards.

On April 25, 1999, Detective Gerard Starkey of the Miami Dade Police Department arrested Londono at the Miami Marriott Hotel on unrelated charges. Upon a search of Londono's burgandy van, Detective Starkey found a postcard of the Nashville riverfront area. Thereafter, Detective Starkey located Gomez at his apartment in the Fontainebleau Hilton Hotel. Upon a search of Gomez's apartment, detectives found $19,600 in cash concealed beneath the kitchen counter above the dishwasher. The detectives also discovered a furniture receipt for $570, dated March 25, 1999, and three money transfer receipts for $6,000, two of which were dated March 23, 1999.

Londono and Gomez were both questioned by the police regarding their involvement in the robbery. The Appellants both denied ever being in Nashville. Co-defendant Guartos was also interviewed and confessed to his involvement in the crime. In Guartos' statement, he said they sold the watches for $230,000 in Miami, and they got $40,000 each. Guartos later denied ever making this statement.

Gomez, Londono, and Guartos[1] were subsequently indicted as follows: Count I, conspiracy to commit aggravated robbery; Count II, felony murder of Roy Rogers; Count III, especially

---

[1]Guartos was tried separately and convicted as indicted.

aggravated robbery of Roy Rogers; and Count IV, aggravated robbery of Eugene Nagele. After a trial by jury, Gomez and Londono were convicted of Count I as charged; Count II, facilitation of felony murder as a lesser included offense; Count III, facilitation of especially aggravated robbery as a lesser included offense; and Count IV, facilitation of aggravated robbery as a lesser included offense. Following a sentencing hearing, the Appellants received a total effective sentence of forty-nine years. The Appellants' motions for new trial were denied, and this appeal followed.

## ANALYSIS

### I. Suppression of Photo Array

Gomez argues that the trial court erred by not suppressing Deborah Sloan's out-of-court photo identification of the Appellant and subsequent in-court identification. Specifically, he contends that "the out of court photo array was impermissibly suggestive and should have been suppressed but also, further contends that due to the impermissible suggestiveness of the out of court identification, the subsequent in court identification should not have been admitted."

The Appellant's motion to suppress was filed on Thursday, January 31, 2002. A hearing on the motion was held on Friday, February 1, 2002. Argument was presented, but no proof was offered. Trial began on Monday, February 4, 2002. The trial court ruled that the suppression issue was waived for failure to comply with the pre-trial scheduling order. The State contends that the issue is, likewise, waived on appeal. We agree.

Pursuant to Rule 12(b)(3), Tennessee Rules of Criminal Procedure, motions to suppress evidence must be raised "prior to trial." *State v. Davidson*, 606 S.W.2d 293, 295 (Tenn. Crim. App. 1980); *Feagins v. State*, 596 S.W.2d 108, 109-10 (Tenn. Crim. App. 1979). Additionally, this rule provides that "the court may, at the time of the arraignment or as soon thereafter as practicable, set a time for the making of pretrial motions or requests and, if required, a later date of hearing." Tenn. R. Crim. P. 12(c). The failure to present a motion to suppress by the time set by the trial court constitutes waiver, but the trial court may grant relief from the waiver for "cause shown." Tenn. R. Crim. P. 12(f); *State v. Hamilton*, 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981); *Davidson*, 606 S.W.2d at 295. Under this rule, defense counsel travels at peril with an untimely motion unless the record adequately reflects cause for the late filing because he or she has the burden of overcoming the waiver. *See State v. Randolph*, 692 S.W.2d 37, 40 (Tenn. Crim. App. 1985).

A hearing on the motion was held on the Friday before trial was to begin. At the hearing, the following colloquy occurred between the court and defense counsel:

> THE COURT: I want to hear you, Mr. Funk, on why I should even entertain these motions. They were filed yesterday, almost at 3:30, somewhere around there. This case has been pending for some period of time. You've been on this case since October, so why should I even hear these motions filed on the eve of trial?
>
> . . .

THE COURT: - - there is no surprise to anybody that there is a photo lineup in this case, and that Ms. Sloan picked out the defendant. I mean, that's been, it was in the first trial. That's been known since day one. I told you when you got in on the case you had better be ready for trial. I wasn't going to put up with delays because of it.

[DEFENSE COUNSEL]: I'm not asking for a continuance, Judge.

THE COURT: Yeah, but you filed a motion, which is an evidentiary issue about suppression of a photo lineup and her in-court testimony, which should have been filed months ago if you expect me to hear it.

[DEFENSE COUNSEL]: I do expect you to hear it.

THE COURT: Why? I guess that is the question. Why? It is too late. You will have to agree it is too late.

. . .

THE COURT: . . . I think the cases say when there is a pretrial scheduling order and you wait until the time of trial, it is too late. You've waived it. That is what they say, and Friday before trial, when there has been months, and you were clearly told that you had to be ready, that it's too late. I mean, mainly because you filed it at 3:30 yesterday.

. . .

THE COURT: . . . The trial starts Monday morning at nine o'clock. When is it that we are supposed to have this hearing.

[DEFENSE COUNSEL]: I'm available any time.

THE COURT: . . . [T]hat is not an appropriate answer, and you know that.

. . .

THE COURT: . . . [E]vidence is going to be introduced in trial about a photo lineup. You've known that since day one; have you not?

[DEFENSE COUNSEL]: That's correct.

A black and white copy of the photo array was provided to the defense during pretrial discovery. The week before trial was to begin defense counsel requested a color version of the photo array from the State. The motion to suppress challenged this color photo array, asserting that it was "unduly suggestive." At the motion hearing, defense counsel argued "suggestiveness" based upon (1) the fact

that the array displayed "OCA" or arrest numbers and (2) the lighting of the Appellant's photograph. In response, the State explained,

> Judge, it was in discovery. [Defense counsel] came down to the office this week because I had the color version. Of course, the copies were in black and white.
>
> Part of what [defense counsel] is complaining about is the copy that I showed . . . , because I was trying to figure out which lineup was Mr. Gomez and Mr. Londono, did have OCA numbers because the detectives keep a copy of that so they will know who is who.
>
> The actual photo lineup used in this case is like all the others. They do not have OCA numbers or arrest numbers on any of them. The detective testified to all that in [Co-defendant Guartos'] trial. There is no issue about the OCA numbers or any identifying marks with regard to the photos.

Moreover, we emphasize, as noted by the State, "[N]obody asked to see it to begin with, the color version, until this week, but the black and white version has been in discovery response from the very beginning." The State then informed the court that it would not be introducing the line-up with the OCA numbers into evidence. Defense counsel withdrew his objection to the line-up on the basis of the OCA numbers and argued that the line-up was suggestive because it was "taken in a different light. . . . [T]he color version has him stand out in a way that is not appearing in the black and white." Regarding the lighting of the photo array, the trial court observed, "I've looked at this photo. This is the color photo, and interestingly enough, the lighting on all of them appears to be a little different. . . . There is nothing in this photo spread that would point to any one, any particular one other than any of the others[.] . . ."

Nonetheless, the trial court was unable to fully develop the suppression issue without the testimony of Ms. Sloan, the witness who identified the Appellant from the photo array, and Detective Tarkington, the officer who showed Ms. Sloan the photo array. Thus, the trial court entered piece-meal findings as the trial progressed and the proof developed.[2] The trial court correctly concluded

---

[2]After Deborah Sloan testified at trial, the trial court found:

> I listened to the proof about the photo lineups and the photo presentation and find that they were neither suggestive nor whatever, so whatever your motion was, I would have ruled against you. Clearly, all the questions you had went toward cross-examination, not admissibility, so just so it is clear in the record that I would not have suppressed either the photo lineup or the lineup in court.

A violation of due process has occurred if the identification procedure is so suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Neil v Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 381 (1972); *see also Bennett v. State*, 530 S.W.2d 511, 512-15 (Tenn. 1975). Second, if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless reliable. *Neil v. Biggers*, 409 U.S. at 199; 93 S. Ct. at 382.

In the instant case, the record clearly supports the trial court's finding that the photo identification procedure was not unduly suggestive. Ms. Sloan had a sufficient opportunity to view the Appellant at the time of the crime and,
(continued...)

that the Appellant had the information within his control and could have filed an appropriate motion in a timely fashion. Under these circumstances, the Appellant's failure to timely file the motion to suppress as required by the trial court's scheduling order constituted waiver of the right to complain about introduction of the photo array and subsequent in-court identification. Tenn. R. Crim. P. 12(f). At the hearing, defense counsel claimed that "[w]e get sent a black and white copy that does not accurately reflect the color copies that are going to be presented at trial, and then that is a surprise to us a week before trial. . . . They are not supposed to provide us with misleading things. . . ." This claim is without merit. The black and white copy did not prevent defense counsel from investigating the case, including requesting a color copy prior to the week before trial. In this case, no threshold showing of good cause for the Appellant's failure to make a timely motion is shown or even suggested.

We are mindful that sanctions for violation of a local or state court procedural rule should not work an undue hardship upon the litigants. In this respect, trial courts should look to the actual or potential prejudice flowing from the violation in considering the course of action to take. *See, e.g.*, *State v. Garland*, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981). Primary purposes of Rule 12(b)(3), which requires filing prior to trial, relate to avoiding interruption and inefficiency in jury trials and to providing the State an opportunity to appeal an adverse ruling while keeping its chance of a successful prosecution if the ruling is overturned. *Feagins*, 596 S.W.2d at 110. It is apparent that the trial court found no just cause for the untimely filing and no just cause to grant relief from the waiver. We believe that the record contains material evidence to support the trial court's discretionary action.

## II. Money found in Gomez's Apartment

Gomez argues that "it was abuse of the trial court's discretion to allow the testimony of [Miami Police] Officer Starkey relating to the $19,600.00 cash seized from the [Appellant's] apartment in that there was no foundation laid to cause that cash to be relevant to the Rolex robbery which was the subject of this trial." His challenge is two-fold. First, the Appellant argues that the State violated discovery Rule 16, Tennessee Rules of Criminal Procedure. Second, he contends that the cash seized from his Miami apartment was connected to a diamond robbery in Texas and, therefore, its admission constituted impermissible evidence of "other crimes, wrongs, or acts" within the meaning of Rule 404(b), Tennessee Rules of Evidence.

Prior to trial, the Appellant filed a *motion in limine* to prohibit "the prosecution from introducing any evidence or testimony of a search conducted of the Fontainebleau Towers, Apartment 117 Miami Florida." This motion was denied as being untimely. However, discovery responses from the State concerning the items discovered in the apartment did not include any mention of the $19,600 seized. After trial had commenced, the State, after speaking with Detective Starkey, who conducted the search of the Appellant's apartment, became aware that this sum of cash

---

[2](...continued)

because of the nature of the crime, Ms. Sloan had a high degree of attention at the time of the incident. There was no evidence or argument presented that the procedure conducted by Detective Tarkington was suggestive in any way. The photographic arrays depicted Hispanic individuals with very similar facial characteristics, hair color, and hair length. Therefore, we conclude that this issue is without merit.

was also discovered in the kitchen cabinet area above the dishwasher. The State promptly informed defense counsel of the information. Defense counsel objected to any testimony regarding the money. The State responded that it only intended to introduce the testimony of the detective as to what he saw in the apartment and did not intend to introduce any physical evidence of the money. The State explained, "[T]he items that were seized from [the Appellant's] apartment came from the FBI and the money was not listed anywhere in their list of items. I think that is probably because the Miami Police Department seized the money and went ahead with proceedings against the money."

During a jury-out hearing, Detective Starkey testified that, on April 26, 1999, he went to the Appellant's apartment to serve a warrant for a diamond robbery in Texas. The Appellant was arrested outside the "entry way to his door." Thereafter, the Appellant gave consent to search the apartment, and a sum of cash in the amount of $19,600 was found "[i]n the kitchen area, up above the dishwasher." The detective further testified that the Appellant did not acknowledge ownership of the cash and that he did not "know whether the cash in this apartment had anything to do with the diamond case as opposed to the Rolex watches case." He also stated that there were indications that three people lived in the apartment.

Following Detective Starkey's testimony, defense counsel again objected to testimony concerning the money, arguing that:

> Officer Starkey can testify about all of the items that were listed in the discovery response. With regards to the money at issue here, I would still maintain that he should not be allowed to testify about money, one, on the grounds that it violates the discovery rules. Obviously, I understand the Court's point that, well, Mr. Gomez knew about the money because he was present when the money was taken and he apparently was served some papers while he was in jail, but that doesn't indicate that that money had anything to do with this case, and for this to all of a sudden whipsaw back on him in the middle of trial and have the State argue that it does have something to do with this case hindered my ability to prepare for this case.
>
> In addition, Judge, I would also say that given that the actual arrest in this case was dealing with a diamond theft that happened closer in time to April 26, '99, than the events in this case, then what we have is proof from one case being introduced as proof on the second case and the only way - - and there is no real way to keep these two separate if you allow the testimony.

Following argument by the State, the trial court ruled:

> All right, well, first of all, I do find that information is sort of subject to the discovery rule; however, as soon as the State became aware of [the evidence, they] advised defense counsel. What I was trying to determine and the reason I wanted to hear was whether or not [the Appellant] had any knowledge of the money, which is clear from the testimony that he did, so that whatever violations there were, it was only compounded by the fact that apparently [the Appellant] didn't tell his attorney, so I'm going to allow the testimony. Clearly, obviously, there is not going to be anything about the diamond situation in Texas.

Back to your issue about the fact it could be proceeds from another crime, well, I don't know that. Maybe, maybe not. It is just hard to say, but I don't think the State has any firm proof. If, in fact, they knew clearly that this was proceeds from another crime, I might buy your argument, but I don't hear any information that would lead me to believe that.

. . .

All right. Now obviously, you are going to be free to question or if you want to put on proof that it came from something else, I guess you can, I mean, I know that is not going to be reasonable, but there is not enough proof in this record from the testimony for me to determine that wasn't involved in this, because it is close in time after this case. There is an awfully lot of, seven-hundred-fifty-thousand dollars ($750,000.00) worth of Rolex [watches] taken, plus there is going to be some statements introduced in evidence, and in fact, they got [two-hundred-thirty-thousand dollars ($230,000.00)] for this, so overrule your objection.

Defense counsel then stated for the record:

This is precisely what Rule 16 deals with. Had I known that this money was going to be charged to this crime, I could have gone and gotten the records from Texas, found out what the Texas authorities have already attributed this money to the diamond crime. [The Appellant] has already pled guilty in Texas to that crime, and if that is a substantive part of their proof that this money was part of that crime, then I'd be able to show that, and then that would prevent you from letting this in, but I haven't had the opportunity to present that evidence or even investigate that.

The court observed, "Just because Texas authorities might have been arguing that would not necessarily preclude Tennessee authorities from arguing that."

## A. Discovery Violation

Rule 16(c), Tennessee Rules of Criminal Procedure, requires:

If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, the party shall promptly notify the other party or the other party's attorney or the court of the existence of the additional evidence or material.

Both the State and a defendant have a continuing duty to disclose evidence previously requested and subject to discovery under Rule 16. Tenn. R. Crim. P. 16(c). When arguing that the State violated Rule 16, a defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD (Tenn. Crim. App. at Knoxville, June 28, 2002) (quoting *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992)). In *State v. Brown*, 552 S.W.2d 383, 386 (Tenn. 1977), our supreme court

noted with approval the ABA Standards Relating to Discovery and Procedure Before Trial; § 2.4 (prosecuting attorney charged only with using "diligent good faith efforts" to obtain discoverable material or information from other governmental personnel). Furthermore, the trial court should refrain from excluding evidence for noncompliance with discovery rules "except when it is shown that Defendant is actually prejudiced by the state's failure and the prejudice cannot be otherwise eradicated." *Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD (quoting *State v. Payne*, 791 S.W.2d 10, 16 (Tenn. 1990)). The Appellant gave consent to search the apartment and was present when the money was found. Also, he had been served with a seizure petition for the money. The State explained why the evidence had not been discovered earlier and immediately disclosed the information to defense counsel. Accordingly, we agree the trial court's ruling admitting this evidence as we find compliance with this rule. *See also* Tenn. R. Crim. P. 16, Note 22.

## B. Character Evidence

Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Finally, Rule 404 deals with "character evidence." Subsection (b) of this rule provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

Contrary to the assertion of the Appellant, Detective Starkey, in his testimony before the jury, did not mention the Texas diamond theft. Rather, the jury was only told that $19,600 had been discovered in the Appellant's apartment. Thus, the jury was not exposed to evidence of other crimes, wrongs, or acts reflecting the Appellant's character as controlled by Rule 404(b). Regarding the relevancy of the cash, the Appellant's argument that the money was not relevant because it represented the proceeds of the diamond theft is, likewise, without merit. An issue of consequence before the jury in this case was whether the Appellant had the intent to benefit in the proceeds or results of the offense. Evidence of the money found in the Appellant's apartment was relevant to establish intent to benefit in the proceeds or results of the offense. Based upon the facts of the case, we conclude, as did the trial court, that the jury could infer that the money located in the Appellant's apartment was the proceeds of the Rolex theft. To determine otherwise would prevent introduction of a large sum of cash when an Appellant commits numerous thefts and allow him to benefit from further criminal activity. Additionally, absent any proof to the contrary, we fail to see how Texas would be better equipped to link a sum of cash to one robbery as opposed to another.[3] The reason

---

[3] At the motion for new trial hearing, defense counsel presented the court with the Appellant's file from the federal public defender's office in the southern district of Florida. The Appellant contended that the file established that the "$19,600 was tied to the theft of the diamonds." However, the file only states, "Gomez consented to a search of the apartment where he was staying and they found the black bag that had the diamonds in it, $19,600 cash, and 2 suitcases full of $34,000 worth of stolen glasses[.]" The Appellant pled guilty to the diamond theft. As noted by the trial court,

(continued...)

the Appellant was in possession of the money is a jury question. Accordingly, the trial court properly admitted the evidence. Furthermore, we conclude that, even if admission of the money was error, such error was harmless and without prejudicial impact upon the jury due to the fact that the Appellant was convicted of facilitation and, thus, the jury determined that the State had not proven he had the intent to benefit in the proceeds or results of the offense. *See* Tenn. R. Crim. P. 52(a).

### III. Co-defendant Guartos' statements

Londono argues that "the trial court erred in admitting the statements attributed to Co-defendant Guartos." In order to establish the existence of a conspiracy, the State moved prior to trial to declare Guartos unavailable as a witness and admit his redacted statements as statements against penal interest, under Tennessee Rule of Evidence 804(b)(3), at the trial of the Appellants. The trial court reserved ruling on the motion until further testimony was developed at trial.

Bryant Guartos was apparently the first to be apprehended and, according to the Appellant, the State elected to sever his case and proceed to try him separately. He was convicted of first degree felony murder, conspiracy to commit aggravated robbery, especially aggravated robbery, and aggravated robbery. His case was on appeal at the time the Appellants went to trial. During a jury-out proceeding, Guartos advised the court that he would exercise his Fifth Amendment privilege against self-incrimination. He was not called to testify. At trial, Detective Tarkington testified that, during his investigation of this case, he interviewed Guartos on March 19, 2000. At trial, Tarkington testified to the following redacted version of Guartos' statements:

> He stated that he and the others were in Nashville. They stayed at the Howard Johnson's and they were, they came to Nashville in two rented vans. One was a wine color or red color and the other one was white, and they took the seat out of one of the vans because they needed more room, and he stated they sold the watches for two-hundred-thirty-thousand dollars ($230,000.00) in Miami, and his proceeds from that, his take of that was forty-thousand dollars ($40,000).[4]

---

[3](...continued)
"I guess if there was a trial and that money was introduced and was linked directly to that, you might have a different issue. But the mere fact that the $19,600 is found," does not preclude "that it's related to the theft of the watches from Carlyle & Company." We agree with the conclusion of the trial court.

[4]This statement was redacted by the State to be inculpatory only in nature. Guartos' original statement as transcribed by Detective Tarkington at the time of the interview reads:

> He stated, "I was there. Maria was there. He named Jonathan, and Chato (Edwin Gomez), Javier as the shooter, and an old man known as Mosquito as the driver of the wine colored van. He stated they used two rented vans which they got from someone in Miami for $2500.00. One of the vans was, "wine colored or red. The other was white." He admitted they stayed at the Howard Johnson Motel and used two rented rooms while in Nashville. He stated he and Maria were in the wine colored van. According to Guartos the others were in the white van. He stated he and Maria took the seat out of the white van at the motel because they needed more room. Later he stated his fingerprints should not have been found on the seat. We asked why and his reply was they (others) wiped it off. He stated they got $230,000.00 for the watches when they were sold in Miami. He stated

(continued...)

-12-

Detective Haney traveled with Detective Tarkington to Miami and participated in the interview with Guartos. Detective Haney also testified as to the contents of Guartos' statements. The trial court ruled that the Guartos' statements were admissible, finding that:

> [O]ne of the issues I have to look at is whether or not Mr. Guartos, when he gave this statement, which was against his penal interest, and that a person reasonably situated in his position would have known it. Now that is how it is relevant. . . . The issue is whether or not he really understood that this was going to be to his detriment and that he also just wasn't trying to shift blame.
>
> Now as I see what [the State] is proposing really does not necessarily implicate the defendants at all and with the prior - - okay, this is what I'm going to rule. I'm going to rule with that . . . this statement can come in.

After each time the statement was testified to in the presence of the jury and in the written jury charge, the trial court provided a cautionary instruction. The following instruction was provided to the jury in the written charge:

> You have heard testimony about statements which were alleged to have been made by Bryant Guartos, and give it such weight, if any, as you believe it deserves. However, you may only consider these statements on the issue of whether the conspiracy charged in Count One existed. You may not consider this evidence in determining whether a particular defendant joined in the charged conspiracy.

## A. Statement Against Interest

Rule 804 of the Tennessee Rules of Evidence provides, in pertinent part, as follows:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) Statement Against Interest. - A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

---

[4](...continued)
he used his $40,000.00 to buy his home in Miami.

We note that, within this statement, a sentence has been "blacked-out" from the copy provided to this court and is, thus, illegible.

The Advisory Commission Comments to the rule state that "this rule follows modern Tennessee law by admitting declarations against penal interest as well as those against pecuniary or proprietary interest."

We find no error by the trial court in admitting the statements of Bryant Guartos over objection by the defense. *See State v. Nathan Alex Weaver*, No. M2001-00873-CCA-R3-CD (Tenn. Crim. App. at Nashville, Apr. 15, 2003). Guartos was clearly an unavailable witness, *see* Tennessee Rule of Evidence 804(a), and, because Guartos admitted to Detectives Tarkington and Haney that he came to Nashville with others in two vans, white and wine-colored, stayed at the Howard Johnson, and they got $230,000 for the watches from the robbery, the contested statements clearly implicate Guartos in a crime. Furthermore, we note that Guartos was convicted of the crimes for which the Appellants are currently on trial. We therefore conclude that Guartos' statements were admissible pursuant to Rule 804 of the Tennessee Rules of Evidence as statements against interest.

## B. Confrontation Clause

Thus, we turn to the substance of the statement to determine its admissibility. *See Nathan Alex Weaver*, No. M2001-00873-CCA-R3-CD. On its face, Guartos' statements qualify as statements against interest because, through his admissions, he exposed himself to liability for multiple criminal charges. However, our inquiry is not ended as we must move from the technical analysis of the rules to the broader analysis of the constitutional implications. *People v. Farrell*, 34 P.3d 401, 405 (Colo. 2001); *Nathan Alex Weaver*, No. M2001-00873-CCA-R3-CD. The Confrontation Clause of the United States Constitution guarantees a criminal defendant the right to confront witnesses against him or her. U.S. CONST. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110 (1974). This right is also protected by the Tennessee Constitution. TENN. CONST. art. I, § 9. The right of confrontation encompasses the right to cross-examine. *Barber v. Page*, 390 U.S. 719, 721, 88 S. Ct. 1318, 1320 (1968). It is the principal means by which the believability of a witness and the truth of his testimony are tested. *Davis*, 415 U.S. at 316, 94 S. Ct. at 1110. The right to confront and cross-examine is not absolute however, and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 1046 (1973). Reliable hearsay which comports with an exception to the hearsay rule does not violate a defendant's confrontation rights. *State v. Causby*, 706 S.W.2d 628, 631 (Tenn. 1986) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980)); *see also State v. Kennedy*, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999). Such statements are deemed "so inherently trustworthy that adversarial testing would add little to their reliability." *Kennedy*, 7 S.W.3d at 66. To meet that high burden of truthfulness, the statement must either (1) fall within a firmly rooted hearsay exception or (2) bear particularized guarantees of trustworthiness. *Ohio v. Roberts*, 448 U.S. at 66, 100 S. Ct. at 2539.

## 1. Firmly Rooted Hearsay Exception

The first question for our consideration is whether the statements made by Bryant Guartos fall within a firmly rooted hearsay exception. *Nathan Alex Weaver*, No. M2001-00873-CCA-R3-CD. We have affirmed the trial court's ruling that the statements made by Guartos to Detectives Tarkington and Haney were statements against penal interest. Tenn. R. Evid. 804(b)(3). We must thus address whether statements against penal interest qualify as a firmly rooted hearsay exception.

A co-defendant's confession given during a custodial interrogation may be motivated by the co-defendant's desire to minimize his own culpability by implicating the accused and, therefore, courts should view the statement with special suspicion. *Farrell*, 34 P.3d at 406; *see also Lilly v. Virginia*, 527 U.S. 116, 131-32, 119 S. Ct. 1887, 1897-98 (1999). A "statement against interest by a co-defendant made during custodial interrogation does not fall within a firmly rooted hearsay exception." *Farrell,* 34 P.3d at 406 (quoting *Stevens v. People*, 29 P.3d 305, 313 (Colo. 2001.)) Because Guartos is a co-defendant, who made statements against interest in the course of a custodial interrogation, his statements cannot be classified as falling under a firmly rooted exception to the hearsay rule. *Nathan Alex Weaver*, No. M2001-00873-CCA-R3-CD.

## 2. Guarantees of Trustworthiness

Accordingly, we turn to the question of whether Guartos' statements possess sufficient guarantees of trustworthiness to be admissible under the reliability requirements of the Confrontation Clause. *Lilly*, 527 U.S. at 135, 119 S. Ct. at 1899; *Roberts*, 448 U.S. at 66, 100 S. Ct. at 3529. In *State v. Henderson*, 554 S.W.2d 117 (Tenn. 1977), the Tennessee Supreme Court reviewed the standards for determining when an out-of-court statement satisfies a defendant's confrontation rights under both the United States and the Tennessee Constitutions. The court stated that at least three criteria must be met in order to satisfy the Confrontation Clause: (1) the evidence to be presented must not be "crucial" or "devastating," (2) the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant, and (3) the evidence offered under a hearsay exception must bear its own "indicia of reliability." *Henderson*, 554 S.W.2d at 119-20.

The first prong of the test requires that the evidence to be admitted must not be "crucial" or "devastating." Evidence is deemed "crucial" if it constitutes an essential element of the crime. *Henderson*, 554 S.W.2d at 119; *Kennedy*, 7 S.W.3d at 65. In this case, the statements were offered to prove that a conspiracy existed, but the jury was instructed that they could not consider the statements "in determining whether a particular defendant joined in the conspiracy." Thus, the statements were not an essential element of the crime and did not constitute "crucial" or "devastating" evidence. The second prong of the test requires the State to make a good faith effort to secure the presence of the declarant. In this case, Guartos stated in court that he would assert his Fifth Amendment privilege if called to testify. The State fulfilled its duty with regard to the second prong.

Finally, the *Henderson* test requires that the evidence to be admitted bear its own "indicia of reliability." To determine whether the statement bears its own "indicia of reliability," the following factors should be considered: (1) whether the statement was truly self-inculpatory; (2) whether the statement was detailed; (3) whether police officers threatened or coerced the defendant to make the statement; (4) whether the confession was offered in exchange for leniency; (5) whether the declarant was likely to have personal knowledge of the events in the statement; (6) whether the declarant made the statement shortly after the described events; (7) whether the declarant had a reason to retaliate against the defendant; and (8) whether the declarant was mentally or physically unstable at the time of the confession. *Farrell,* 34 P.3d at 406-07. The statement as redacted was truly self-inculpatory. Guartos understood that the giving of the statement was detrimental to him. He accepted direct culpability, did not try to minimize his own involvement, and was not merely

trying to shift the blame. Moreover, it was detailed. The statement describes the various crimes and sequence of events at a level that would be difficult to fabricate. Guartos specified the amount of his share in the robbery and described the two vans that the group used in effectuating the robbery. Detective Tarkington described the interview process as "very calm" and testified that he did not make any promise of leniency in exchange for the confession. Guartos confessed to his involvement in the crimes and named other individuals who participated in the robberies. He expressed no animosity towards anyone. Additionally, Detective Tarkington testified that Guartos did not appear to be under the influence of any intoxicant or exhibit any strange behavior.

Thus, we conclude that, although the statement does not fall into a firmly rooted hearsay exception, it was nonetheless supported by sufficient guarantees of trustworthiness to support its admissibility under the Confrontation Clause. The three prongs of the *Henderson* test were satisfied. The trial court, after considering all relevant factors and cautioning the jury about the use of the statements, properly admitted Guartos' statements at the trial of the Appellants.

### IV. Admissibility of Rogers' statements

The Appellant contends the trial court erred by allowing the deceased Rogers' inadmissible hearsay statement into evidence at trial. He asserts that the statement did not qualify as either an excited utterance, Tennessee Rule of Evidence 803(2), or a dying declaration, Tennessee Rule of Evidence 804(b)(2). We disagree.

Officer Finchum was the first police officer to arrive at Green Hills Mall after the robbery and shooting. Upon arrival Officer Finchum observed the victim, Roy Rogers, lying in the parking lot with a "bullet hole in his chest." According to Officer Finchum, Rogers looked "ashen[.] . . . He was clearly in bad shape." Officer Finchum further testified:

> Well, again, he was laying down on his back. He had a bullet hole in his chest, what appeared to be a bullet hole. . . . I immediately asked him what had happened at that point in time, because it looked like he was kind of fading pretty quick on me and I wanted to get as much information as I could from him as quick as I could, and so I asked him, I said, you know, what happened, you know, and I said who shot you? He said it was a man, a mulatto. He said he had on a dark hood. . . . I asked him a couple more questions and I saw I really wasn't going to get anything more out of him. I again called the dispatcher and told them to have that ambulance step it up.

Rogers died twenty-one days later from complications from his gunshot wound. The Appellant had previously objected to the testimony about the assailant being "mulatto."

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements, in general, are inadmissible. Notwithstanding, the reliability and circumstantial guarantees of trustworthiness of certain nontestimonial statements have permitted courts to carve out various limited exceptions to the hearsay rule.

-16-

The rules of evidence provide for an excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2). An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2); *see also State v. Gordon*, 952 S.W.2d 817, 819 (Tenn. 1997). In order for a statement to qualify as an excited utterance, (1) there must be a startling event or condition, (2) the statement must relate to the startling event or condition, and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. *Gordon*, 952 S.W.2d at 820. The underlying theory of this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication. *State v. Land*, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). "The ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993) (citations omitted). Moreover, "it is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996) (citations omitted).

In the instant case, being robbed at gun point and shot in the chest undoubtedly qualified as a startling event. Additionally, the statement was made shortly after the event. Officer Finchum arrived on the scene minutes after the robbery and shooting occurred. The statement related to the identity of the assailant. Furthermore, Officer Finchum described Rogers as "ashen," "in bad shape," and "fading pretty quick." Based upon these facts, we conclude that the statement was made while Rogers was under the stress of being robbed and shot. Accordingly, the statement qualified as an excited utterance, and the trial court did not abuse its discretion by admitting the statement.

The trial court also considered admission of Rogers' statement as a dying declaration and, "as a matter of caution," submitted an instruction to the jury in that regard. *See* 7 TENNESSEE PRACTICE, TENNESSEE PATTERN JURY INSTRUCTIONS – CRIMINAL § 42.15 (Comm. of the Tenn. Judicial Conference 5th ed. 2000). Tennessee Rule of Evidence 804(b)(2) provides the circumstances that allow for the hearsay rule exception known as a dying declaration: "In a prosecution for homicide, a statement made by the victim while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death." There are four preliminary facts that must be proven prior to admitting a hearsay statement under the exception for a dying declaration: (1) the declarant must be dead, (2) the statement must be admitted only in a homicide prosecution in which the declarant is the victim, (3) the statement must concern the cause or circumstances of death, and (4) the declarant must have spoken or written the statement under the belief that death was imminent. *See* NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE, § 8.35[2] (4th ed. 2000). The last provides the indicia of reliability and truth that justifies admission of the statement. *Id*.

During trial, the trial court ruled, "I will also again instruct the jury about a dying declaration which will tell them about how they are to receive that because I think from what he testified to about him being ashen, being shot in the chest, knew he was in grave condition, from Officer Finchum's testimony, that that would qualify[.] . . ." This court has previously held that it is not necessary that the declarant state unequivocally a belief that death is imminent. *State v. Maruja*

-17-

*Paquita Coleman*, No. 01C01-9401-CR-00029 (Tenn. Crim. App. at Nashville, July 31, 1997). "Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical testimony concerning the seriousness of the victim's condition." *Id*. (citations omitted). Importantly, it is not necessary that the victim die shortly after making the statement to qualify for the hearsay exception as a dying declaration if the requirements of the rule are satisfied. *Id*. The law requires only that the declarant believed death was "imminent;" proof that the dying declarant believed that death would come within a specified number of hours or minutes is not reasonable. One authority states that the rationale for this exception is that one facing imminent death will be truthful for fear of "eternal consequences." COHEN, § 8.35[2]. Clearly, the declarant's *belief* is the crucial factor.

The Appellant contends that there was no proof that Rogers had the requisite belief in his own imminent death. We disagree. According to the medical report, the cause of death was determined to be complications from a gunshot wound to the chest. Mr. Nagele testified that the victim yelled, "Gene, Gene, I've been shot, I've been shot" and that he kept saying, "stop the bleeding, stop the bleeding." The testimony of Officer Finchum indicated that Rogers believed he was gravely injured. According to Dr. Thomas Deering, a foresenic pathologist, Rogers would have died "within minutes to hours" had he not received medical attention because his injuries were severe and "the bleeding would have been fairly extensive." Given the facts, Rogers' belief that his death was imminent can be readily inferred. Since the evidence supports the trial court's conclusion that the victim was aware of his impending death at the time he made the statement to Officer Finchum, we cannot say that the trial court abused its discretion by admitting Rogers' statement as a dying declaration. The Appellant is not entitled to relief on this issue.

## V. Sufficiency of the Evidence

Londono argues that the evidence introduced at trial was insufficient to support his convictions for conspiracy to commit aggravated robbery, facilitation of the first degree felony murder of Roy Rogers, facilitation of the especially aggravated robbery of Roy Rogers, and facilitation of the aggravated robbery of Eugene Nagele. Specifically he is contending that the evidence is insufficient because Deborah Sloan's identification, Tiffany Dozier's identification, and the fingerprint evidence are unreliable.

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. 1999); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, the Appellant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable

to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The following definitions are pertinent to the convictions for which the Appellant was convicted. First degree felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code. Ann. § 39-13-202(a)(2) (2003). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting in fear." Tenn. Code Ann. § 39-13-401(a) (2003). Robbery is aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1)(2003). Additionally, robbery becomes especially aggravated when it is accomplished with a deadly weapon and the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2003). The Appellant was convicted of facilitation of these crimes. To support a conviction for facilitation, it must be shown that an accused (1) knew another person intended to commit a specified felony, (2) but without the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, (3) knowingly furnished substantial assistance in the commission of the felony. Tenn. Code Ann. §§ 39-11-402(2), -403(a) (2003). Finally, the Appellant was also convicted of conspiracy to commit aggravated robbery:

> [I]f two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code. Ann. § 39-12-103(a) (2003).

In the light most favorable to the State, the proof established that, on March 17, 1999, Rogers and Nagele were removing approximately $750,000 worth of Rolex watches from Carlyle & Company Jewelers, when they were robbed of the watches and Rogers was mortally wounded. The assailants also took Nagele's Colt pistol. Nagele was unable to identify any of the attackers but testified that they spoke in a foreign language. Deborah Sloan, an eyewitness, saw the aftermath of the shooting and the circumstances surrounding the robberies. She described the three men as having "dark skin, dark hair, fairly-average height and weight." Further, she stated that the men were in their twenties and they drove away in a "purplish-maroon color" van. Ms. Sloan later identified Gomez, Londono, and Guartos as the assailants. She also identified Londono and Gomez at trial. Following an investigation, it was determined that the assailants stayed at a Howard Johnson Motel on Charlotte Pike. A motel employee, Tiffany Lee Dozier, identified Gomez and Londono from photographic arrays. Fingerprints taken from the hotel matched those of the Appellants. Additionally, ammunition found in the motel closet was consistent with the bullet which struck the victim Rogers. Also, phone records from the motel showed calls to pay phones in the Green Hills Mall. Londono's girlfriend, Julie Jimenez, testified that Londono related the events of the robbery to her and that he stated he wanted to give her a Rolex watch. While he gave a different version of events, he did admit to Jimenez that he took the watches. Upon a search of Londono's burgundy van in Miami, detectives found a postcard of the Nashville riverfront area. Additionally, upon a search of Gomez's Miami apartment, detectives found $19,600 in cash concealed beneath the kitchen

counter. In Guartos' statement, he said they sold the watches for $230,000 and they got $40,000 each.

The determination of the weight and credibility of the testimony of witnesses and reconciliation of conflicts in that testimony are matters entrusted exclusively to the trier of fact and not this court. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Likewise, the credibility of eyewitness testimony identifying the accused as the perpetrator of the criminal offense for which he stands trial is a question of fact for the determination of the jury upon consideration of all competent proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App.1993). The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. *Id.* at 87-88. Despite any conflicts within the proof at trial, as the arbiters of the credibility of the witnesses, the jury chose to accredit the testimony of the State's witnesses and reject the claims of the Appellant. The Appellant has had his day in court. This court may not reevaluate the evidence or substitute its inferences for those drawn by the trier of fact from the evidence. *Cabbage*, 571 S.W.2d at 835. The proof introduced at trial is legally sufficient to support the Appellant's convictions. Accordingly, we find that this issue is without merit.

## VI. Sentencing

Following a sentencing hearing, both Appellants, as Range I standard offenders, received respective sentences of six years for their convictions for conspiracy to commit aggravated robbery, twenty-five years for their convictions for facilitation of first degree felony murder, twelve years for their convictions for facilitation of especially aggravated robbery, and six years for their convictions for facilitation of aggravated robbery. These sentences were ordered to be served consecutively to one another. Londono's sentences were also ordered to be served consecutively to his federal sentence for theft of diamonds and his Texas sentence for manslaughter. This was the maximum sentence permissible for both Appellants. Both Appellants contend that the trial court improperly applied enhancement factors and erred in imposing consecutive sentencing.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997); *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *Ashby*, 823 S.W.2d at 169. When conducting a *de novo* review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the pre-sentence report; (c) the principles of sentencing and arguments as to sentencing alternatives, if so eligible; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Appellant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103, -210 (1997); *Ashby*, 823 S.W.2d at 168. Furthermore, we emphasize that the Appellant bears the burden of showing that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments (2003).

## A. Length

In determining the Appellants' sentences, the trial court considered three enhancement factors: (1) The Appellants have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (2) The Appellants were leaders in the commission of the offense involving two or more criminal actors; and (3) The Appellants possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114(1), (2), (9) (1997).[5]

The trial court applied enhancement factor (1) to all of the Appellants' convictions and gave this factor great weight. Gomez does not challenge the use of this enhancement factor; however, Londono does, arguing that this factor "should not have been applied since the criminal behavior used occurred after the commission of the offense for which he stands convicted." The Appellant's criminal history includes a conviction for "Theft from Interstate Shipment, April 14, 1999, United States District Court, Northern District of Texas, Ft. Worth Division."[6] Londono's history also includes a conviction for "Manslaughter, April 12, 2000, Houston, Texas, Criminal Court." The trial court noted, "[F]or enhancing factors, factor number one, isn't there all kinds of case law that says it doesn't even have to be convictions, but that the behavior can occur after the crime." Defense counsel conceded that there was substantive case law contrary to his position but, nonetheless, argues on appeal, without any citation to case law, that application of this factor amounts to "an *ex post facto* type situation." This court has previously held that a sentencing court "can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as constituting a previous history of criminal convictions or criminal behavior, regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." *State v. John Allen Chapman*, No. 01C01-9604-CC-00137 (Tenn. Crim. App. at Nashville, Sept. 30, 1997) (quoting *State v. Poole*, No. 02C01-9506-CC-00178 (Tenn. Crim. App. at Jackson, Jan. 31, 1996), *aff'd*, 945 S.W.2d 93 (Tenn. 1997)); *see also State v. Jordan*, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003). Such past criminal behavior on the part of the Appellant adequately supports application of enhancement factor (1) to all convictions.

With regard to contested enhancement factor (2), the Appellants were leaders in the commission of the offenses, we find that the proof in the record supports its application. At the sentencing hearing, the trial court observed,

> [T]he facts in this case are pretty overwhelming in the sense of we have individuals who decided that they were going to come to Nashville, Tennessee. They came here in order to rob and to steal . . . Rolex watches, and they did a very methodical approach, renting a hotel room at the Howard Johnson's, and the testimony from that was that clearly there were two people that kept coming up to the registration, one of

---

[5]We note that, because of recent renumbering of the enhancements factors under this section, the correct enhancement numbers are now (2), (3), and (10). *See* Tenn. Code Ann. § 40-35-114 (2003).

[6]Neither of these convictions are contained in the presentence report; however, they were provided by the State in its "Notice of Intent to Use Convictions or Prior Bad Acts for Impeachment Purposes."

which was Mr. Guartos and is the one who spoke English whereas the other individual didn't.

There they arm themselves, clearly left behind a box of ammunition with Mr. Londono's fingerprint on it, and there they proceeded to go to the Green Hills Mall where they staked that out the day before. . . . They were . . . waiting for the individuals to come out with the watches and there they committed the crime and then sped off, and actually this crime, the way it was planned out so methodical, probably would not have been solved if it hadn't been for the lady driving down the Interstate.

In weighing this factor, the trial court stated, this factor "is going to be considered but the wieght is not that great[.]" Both Appellants challenge the application of this factor. Gomez argues that he was convicted of facilitation, and "the very definition of facilitation would negate a finding that he could have been a leader in the offense." Londono contends that application of this factor was improper because "the record is void of any testimony that places him in any sort of leadership position." First, a trial court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2003). Second, this court has held that "enhancement for being a leader in the commission of an offense does not require that the Appellant be the sole leader but only that he be 'a' leader" in the commission of the offense. *State v. Hicks*, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) (citation omitted). We agree with the finding of the trial court that, based upon the fingerprint evidence, the testimony at trial, and the methodical nature of the crime, the Appellants were leaders in the commission of these offenses. Accordingly, we find the trial court's application of enhancement factor (2) to all of the Appellants' convictions was proper.

Finally, the trial court applied factor (9) only to the Appellants' convictions for facilitation of first degree felony murder. Gomez contends that "there was no proof as to who possessed or fired a weapon." Londono appears to be arguing that, because they were only convicted of facilitation, their sentences cannot be enhanced based upon this factor as the jury rejected a theory of criminal responsibility. The underlying felony in this case is the robbery of Rogers. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Thus, the use of a firearm is not an essential element of robbery. However, while there is no question that a firearm was employed during the commission of the offense, there is no evidence to connect the firearm to either Appellant. We cannot conclude that this enhancement factor can be applied vicariously under the facts presented. *See State v. Johnny Wayne Harris and Gary L. (Jake) Harris*, No. 03C01-9507-CC-00202 (Tenn. Crim. App. At Knoxville, July 19, 1996). Accordingly, enhancement factor (9) does not apply to the Appellants' convictions for facilitation of first degree felony murder.

When there are enhancement factors and no mitigating factors, there is no presumptive sentence and the court may sentence above the minimum in the range. Tenn. Code. Ann. § 40-35-210(d). The weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. *State v. Boggs*, 932 S.W.2d 467, 475-76 (Tenn.

Crim. App. 1996). The weight to be afforded mitigating and enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved. *Id*. at 476; *see also State v. Marshall*, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). Enhancement factors (1) and (2) are of particular weight in this case. Under these circumstances, the trial court was justified in imposing the maximum sentence for each conviction.

## B. Consecutive Sentencing

In its sentencing decision, the trial court imposed consecutive sentences with regard to each Appellant. Concerning Gomez, the trial court reasoned in part as follows:

> I am . . . going to find that he is a dangerous offender, and that the behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high.
>
> He is also, and if I find that factor, in order to use consecutive sentences, I have to determine that the aggregate term reasonably relates to the severity of the offenses and it's necessary in order to protect the public from further serious criminal conduct by the defendant.
>
> Well, clearly, after these events, Mr. Gomez goes and is involved in another major theft for which he has now been convicted in Federal Court for that, so clearly, the aggregate sentence must be as great as possible in order to protect the public from further serious criminal conduct. This is a horrible crime that occurred in this community for which individuals decided to come here and do it. It is not a crime for which it was spur of the moment or otherwise, so I'm going to find by definition that he is a dangerous offender and given the history that it is a justly deserved sentence under the circumstances pursuant to Wilkerson, so I am going to [order] all sentences consecutive.

Gomez argues that consecutive sentencing was error because (1) the circumstances surrounding the offenses in all counts, apart from those inherent in the offenses themselves, were not aggravated, (2) the aggregate length of the sentence does not reasonably relate to his convictions, and (3) it is not necessary to protect the public from future criminal activity by the Appellant. Furthermore, he contends, citing *State v. Massey*, 757 S.W.2d 350, 353 (Tenn. Crim. App. 1986), that consecutive sentencing is inappropriate "for 'episodic offenses,' *i.e.*, one criminal act involving multiple victims, or multiple offenses committed simultaneously or serially against a single victim. The offenses for which the trial court imposed consecutive sentences involves (sic) one victim and were clearly part of a single criminal episode."

Regarding Londono, the trial court imposed consecutive sentences and reasoned as follows:

> [H]e is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Looking at Wilkerson, in order to determine the appropriate sentence, I have to determine that the aggregate term reasonably relates to the severity of the offenses.

Again, this was a horrible crime for which two security guards doing their job were robbed of seven-hundred-fifty-thousand dollars ($750,000.00) worth of Rolex watches in sort of an ambush situation, and necessary in order to protect the public from further serious criminal conduct by the defendant. He has since been convicted of manslaughter and a theft involving a large number of diamonds.

All that indicates that Mr. Londono needs the maximum sentence in this case, so all sentences are going to run . . . consecutive to each other, consecutive to his Federal sentence and consecutive to his Texas sentence[.] . . .

Londono contends that this decision was error because "in order to facilitate all of the results he would necessarily have had to conspire with the others and therefore the offenses are inseparable and therefore all of the conduct merges into one act for which he should have received concurrent sentences."

Tennessee Code Annotated § 40-35-115(b)(4) (2003) provides that the sentencing court may order sentences to run consecutively if the court finds by a preponderance of the evidence that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" If a defendant is found to be a dangerous offender, the court must also find that the aggregate sentence is reasonably related to the severity of the offenses and is necessary to protect the public from further criminal activity of the offender. *State v. Wilkerson*, 905 S.W.2d 933, 936-38 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456 (Tenn. 1999) (holding *Wilkerson* factors were limited to sentencing of "dangerous offenders"). Moreover, in determining whether the sentencing court providently exercised its discretion, "the overriding concern" is the fairness of the resulting sentence under all the circumstances. *State v. Sullivan*, No. M1999-02547-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 13, 2000); *see generally Gray v. State,* 538 S.W.2d 391 (Tenn. 1976).

The focus is "upon the presence of aggravating circumstances" surrounding the crime or crimes for which a defendant is on trial. *Gray*, 538 S.W.2d at 393. We find that, contrary to the assertions of Gomez, *State v. Massey* is not controlling. In *Massey* the court observed that a criminal episode, involving non-aggravated crimes, may become aggravated by the number of crimes committed or the number of victims involved. *Massey*, 757 S.W.2d at 353. However, in the present case, the crimes for which the Appellants were convicted are themselves aggravated.

The following aggravated circumstances exist. The Appellants are from Miami and traveled to Nashville specifically for the purpose of committing this robbery. As the trial court noted:

They did a very methodical approach, renting a hotel room at the Howard Johnson's. . . . There they arm themselves, clearly left behind a box of ammunition with Mr. Londono's fingerprint on it, and there they proceeded to go to the Green Hills Mall where they staked that out the day before. . . . They were . . . waiting for the individuals to come out with the watches and there they committed the crime and then sped off[.]

This was an "ambush situation." They quickly knocked Nagele unconscious and stole his weapon. Then, they executed Rogers. Additionally, after the commission of this robbery, both Appellants were involved in a diamond theft in Texas.

Sentencing is inescapably a human process that neither can nor should be reduced to a set of fixed and mechanical rules. *Wilkerson*, 905 S.W.2d at 938. The trial court imposed respective consecutive sentences for an effective forty-nine-year sentence. Upon *de novo* review, we conclude that the imposition of consecutive sentences for each Appellant was appropriate based upon their classifications as dangerous offenders. Furthermore, the aggregate sentence imposed is reasonably related to the severity of the offenses and is necessary to protect the public from further criminal acts by the Appellants. Accordingly, the Appellants' sentencing issues are without merit.

## CONCLUSION

Based upon the foregoing, we conclude that the issues raised on appeal are without merit. The trial court properly admitted (1) Deborah Sloan's out-of-court and in-court identification of both Appellants, (2) testimony concerning $19,600 found in Gomez's apartment, (3) the statements of Co-defendant Bryant Guartos, and (4) the statements of the victim Rogers as either an excited utterance or a dying declaration. The evidence was sufficient to sustain the Appellants' convictions. We further conclude that the Appellants' sentences were not excessive as to length and that consecutive sentencing was appropriate. Accordingly, the judgments of conviction and resulting sentences are affirmed.

_____
DAVID G. HAYES, JUDGE